Travis W. Kinzler
COK KINZLER PLLP
35 North Bozeman Avenue
P. O. Box 1105
Bozeman, Montana 59771-1105
Telephone: (406) 587-4445
Facsimile:  (406) 587-9465
twkinzler@cokkinzlerlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MONTANA
# HELENA DIVISION

| | |
|---|---|
| MATTHEW SELVIG, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF A.S., DECEASED, ALEISA SELVIG, INDIVIDUALLY AND AS CONSERVATOR OF T.S., AND SUSAN SELVIG,<br><br>          Plaintiffs,<br><br>  VS.<br><br>FCA US LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND JOHN DOES I-V,<br>          Defendants. | No. CV-23-87-H-BMM-JTJ<br><br><br><br><br><br><br><br><br><br><br>**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, for their Complaint against Defendants, allege as follows:

## Parties

1. Matthew Selvig, a resident of Helena, Montana, is the duly appointed Personal Representative of the Estate of A.S., a minor child, deceased. Matthew Selvig is the father of A.S.

2. Aleisa Selvig, a resident of Helena, Montana, is the duly appointed Conservator of T.S., a minor child.

3. Plaintiff T.S. is a nine-year-old minor, the son of Plaintiffs Matthew and Aleisa Selvig. Plaintiff T.S. is also the brother of A.S.

4. A.S. was ten years old when she passed away from injuries sustained when, on June 9, 2022, she was struck by a 2017 Ram pickup truck (the "Ram" or "Pickup").

5. Susan Selvig, a resident of Helena, Montana, is the grandmother of T.S. and A.S.

6. Susan Selvig was present with her grandson, T.S., and A.S. when A.S. was struck by the Pickup.

7. Defendant FCA US LLC is a limited liability company organized under the laws of the State of Delaware. It is named herein on behalf of itself and any and all predecessor corporations or entities of FCA US LLC,

including but not limited to Chrysler Group, LLC, and DaimlerChyrsler. Defendant FCA US LLC shall hereinafter be referred to as "FCA."

8. FCA is the manufacturer and a distributor of the Pickup.

9. Defendants John Does I through V are individuals, partnerships, corporations, and other unknown to Plaintiffs who may be responsible and liable to Plaintiffs.

## Jurisdiction and Venue

10. FCA manufactured and distributed the Pickup at issue, a 2017 Ram pickup truck.  FCA manufactured and distributed the Pickup at issue, a 2017 RAM, VIN 1C6RR7NT8HS772830.

11. Based upon corporate disclosure statements filed by Defendant FCA in other matters, its parent company is FCA North America Holdings LLC, and no publicly owned company owns more than a ten percent (10%) interest in FCA.

12. Upon further information and belief, Defendant FCA is one of several subsidiaries that were involved in the January 2021 merger of Fiat Chrysler Automobiles, N.V. and Peugeot, S.A.

13. Upon further information and belief, the members and/or owners of Defendant FCA are citizens and residents of Michigan and/or Delaware,

and none of the members or owners of Defendant FCA are citizens or residents of the State of Montana.

14. Defendant FCA's principal place of business is in the State of Michigan.

15. Defendant FCA has purposefully directed business activities towards the State of Montana.

16. FCA is part of a global auto company that systematically served a market in Montana for the very vehicle that Plaintiffs alleged to be defective and injured Plaintiffs in Montana.

17. FCA marketed 2017 Ram pickup trucks, including the Pickup, throughout the United States, and they were sold through a network of dealerships, including Dodge dealerships in Montana.

18. Upon information and belief, FCA first placed the Pickup into the stream of commerce through a dealership in Washington State.

19. This Court has jurisdiction of the parties and subject matter.

20. As set forth above, the parties are diverse.

21. The amount in controversy exceeds $75,000.00.

22. The Plaintiffs reside in Lewis and Clark County, Montana, and the crash occurred in Lewis and Clark County.

23. Thus, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## Factual Background

**A.   The Crash**

24.   On June 9, 2022, the two minor children, A.S. and T.S. (the "Children"), went for a bike ride with their grandmother, Susan Selvig. The Children wore appropriate safety equipment, including helmets.

25.   Traveling west near Canyon Ferry Road, the Children and Susan sought to cross Bannack Road. They observed an SUV seeking to make a right turn from westbound Canyon Ferry Road on Bannack Road. Accordingly, the Children and grandmother waited in the grassy shoulder for the SUV to make its right turn.





26. The Children and grandmother were not on their bikes but standing and holding their bikes waiting to cross the street.

27. The SUV slowed to make the right turn onto Bannack Road.

28. The Ram was traveling behind the SUV.

29. The driver of the Ram had set cruise control to 61 miles per hour.

30. The driver of the Ram did not recognize that the SUV was slowing to make a right turn onto Bannack Road in time to avoid the SUV by braking alone.

31. The Ram driver recognized too late to stop that the SUV in front of him was slowing for the right turn.

32. After recognizing too late to stop that the SUV was slowing, the Ram driver braked aggressively and veered to the right to avoid a collision.

33. According to the Montana Highway Patrol report, "[the Ram] ran off the roadway to the right, struck a delineator post, and collided with one of the pedestrians [A.S.] and her bike. One other bike was struck but the pedestrian holding it [T.S.] jumped out of the way and sustained only a minor scrape to his knee. The struck pedestrian [A.S.] was thrown approximately 82 feet from impact."

34. The Montana Highway Patrol diagrammed the crash as follows:



35. Both of A.S.'s parents arrived at the scene as paramedics attempted life-saving measures.

36. A.S. was transported to a nearby hospital, where she was pronounced deceased.

37. T.S. witnessed the crash that resulted in his sister's death and sustained injuries.

### B.  Rear-End Collisions

38. Rear-end collisions are the most common form of automobile collision or crash, generally accounting for approximately one-third of automobile crashes in the United States. *NTSB Special Investigation Report, "Vehicle- and Infrastructure-Based Technology for Prevention of Rear-End Collisions" (May 2001)*, at 1.

39. According to a 2015 study by the National Transportation Safety Administration (NTSB), rear-end collisions account for "almost half of all two-vehicle crashes." *2015 NTSB Report*, at. 6.

40. The primary cause of rear-end collisions is driver distraction. *Id*. "87 percent of rear-end crashes involved some degree of driver inattention." *Id*.

41. In an oral statement given on June 8, 2015, NTSB Chairman Hart stated that there were 1.7 million rear-end collisions in 2012, resulting in more than 1,700 deaths and 500,000 injuries.

### C.  Technologies that prevent or mitigate rear-end collisions

42. There are at least three radar, camera, or lidar-based technologies that either prevent or mitigate rear-end collisions. These include forward collision warning, adaptive cruise control, and automatic emergency braking.

### 1. Forward Collision Warning

43. Forward collision warning ("FCW") was initially developed in the early to mid-1990s.

44. FCW is a simple technology in which a driver receives some form of alert when a danger, such as a stopped or slow-moving vehicle, is detected ahead.

45. Some trucks had some form of FCW installed by the mid-1990s, nearly twenty-five years ago.

46. By the late 1990s, Eaton VORAD, a supplier of FCW components in the 1990s, was actively marketing its FCW system to truck companies throughout the United States, with "over 2 billion miles of over-the-road experience" by the summer of 1999. *2001 NTSB Special Investigation Report,* at 22.

### 2. Adaptive Cruise Control

47. A second forward collision avoidance technology is adaptive cruise control ("ACC"). Adaptive cruise control is a system designed to help

vehicles maintain a safe following distance and stay within the speed selected by the driver. This system adjusts a car's speed automatically, so drivers don't have to. Adaptive cruise control typically includes a braking element if traffic in front of the vehicle is slowing or stopped.

48.   Cruise control was first developed in 1948.

49.   However, cruise control did not have the ability to adapt to high-traffic situations or where the driver may need to slow or stop.

50.   This issue was resolved in 1990, when General Motors' engineers William Chundrlik and Pamela Labuhn invented adaptive cruise control.

51.   In 1995, Mitsubishi installed an adaptive cruise control system in a production vehicle, the 1995 Diamante sedan, then for the Japanese market only.

52.   Toyota followed suit with its 1997 Toyota Celsior.

53.   In 1999, Mercedes—part of the predecessor company to FCA, DaimlerChrysler —introduced ACC to the United States, with "Distronic", the first radar-assisted ACC, installed on model year 2000 Mercedes-Benz S-Class (W220) and the CL-Class.

54.   U.S.-based automaker General Motors introduced radar ACC on its 2004 model year Cadillac XLR.

55. In 2005, Acura introduced in the United States radar ACC integrated with a Collision avoidance system (Collision Mitigation Braking System ("CMBS")) in the model year 2006 Acura RL.

56. In 2010, Ford debuted its first North American ACC system on the sixth-generation Ford Taurus.

57. FCA introduced ACC on the model year 2011 Jeep Grand Cherokee which, according to FCA product description, "automatically adjusts cruising speed to maintain a preset distance between your vehicle and the one ahead."

58. FCA introduced full speed range radar "Adaptive Cruise Control with Stop+" on the model year 2014 Jeep Grand Cherokee.

59. FCA also introduced full speed radar "Adaptive Cruise Control with Stop+" on the model year 2015 Chrysler 200.

### 3. Automatic Emergency Braking

60. Automatic emergency braking ("AEB") is an automated follow-up to forward collision warning and adaptive cruise control.

61. AEB has two related sub-technologies. The first is dynamic brake support ("DBS"), which activates if a driver brakes before an impending collision but does not brake hard enough to prevent the collision. DBS automatically supplements the driver's braking in an effort to avoid a crash.

62. A second AEB technology is crash imminent braking ("CIB"). If a driver does not brake at all with a potential impending crash CIB automatically applies the vehicle's brakes to slow or stop the car, avoiding the crash or reducing its severity.

63. Honda was the first major automaker to install this safety feature in a production vehicle, installing it in one of its model year 2003 vehicles.

64. In addition to the foregoing technologies, FCA chose not to install a driver monitoring system in its 2017 model year Rams.

65. One form of a driving monitoring system ("DMS") uses a camera to monitor driver alertness that not only recognizes the driver but also checks his or her level of vigilance. Its purpose is to alert the driver when signs of drowsiness or distraction are detected. There are other forms as well that effectively monitor the alertness of the driver.

66. Driver monitoring systems are independent active safety systems to help prevent crashes but also allow for a forward collision avoidance system to alert drivers earlier as needed.

67. Driver monitoring systems have been available in production vehicles since at least 2006.

## Claim For Relief

## Count One

## Strict Liability

68. Plaintiff incorporates the foregoing paragraphs as fully set forth herein.

69. Defendant FCA designed and manufactured the 2017 Ram pickup, which was defective within Mont. Code Ann. §27-1-719 (2021), specifically, FCA informed decision to withhold technological vehicle collision avoidance technologies and safety features which was a cause of damages to Plaintiffs.

70. The 2017 Ram pickup was defective and unreasonably dangerous due to its above-average size, including its increased height and weight compared to most other vehicles on the road, and FCA's failure to install driver assistance technologies they had available, which are proven to avoid crashes like the one described in this complaint.

71. FCA was, at all times, relevant to this lawsuit, engaged in the business of designing, manufacturing, assembly, marketing, selling, and otherwise distributing the 2017 Ram pickup.

72. The 2017 Ram was defective within Mont. Code Ann. §27-1-719 (2021) and unreasonably dangerous due to the lack of the following features intended to prevent crashes:

   a. Forward Collision Warning

   b. Adaptive Cruise Control

   c. Automatic Emergency Braking

   d. Driver Monitoring Systems/Drowsy Driver Detection

73. The defective condition of the 2017 Ram was a substantial contributing factor and a legal cause of injuries sustained by Plaintiffs. Plaintiffs have sustained and will continue to sustain damages.

## Count Two

## Negligence

74. Plaintiffs incorporate the foregoing paragraphs as fully set forth herein.

75. Defendant FCA owed and owes the consuming public and those using its vehicle a duty to design reasonably safe vehicles.

76. Defendant FCA knew or should have known, that its relatively large pickup trucks create a higher risk of serious injury or death when involved in collisions, especially collisions with pedestrians.

77. Defendant FCA knew or should have known, that rear-end collisions are one of the leading causes of automobile-related injuries in the United States.

78. Defendant FCA knew or should have known, that drivers' late efforts to avoid rear-end collisions are one of the very serious and significant causes of automobile-related injuries in the United States.

79. Defendant FCA knew or should have known, that it could have eliminated, or at least mitigated, the dangerousness of rear-end collisions and rear-end collision avoidance steering maneuvers in its vehicles, including the 2017 Ram by adding the following safety features to that vehicle:

   a. Forward Collision Warning

   b. Adaptive Cruise Control

   c. Automatic Emergency Braking

   d. Driver Monitoring Systems/Drowsy Driver Monitoring

80. Due to Defendant FCA's negligent development and use and dangerous and defective design of the 2017 Ram pickup, Defendants caused damages to Plaintiffs.

81. Plaintiffs have sustained and will continue to sustain damages that will be proven at trial.

## Prayer for Relief

Wherefore, Plaintiffs demand:

1. An award for compensatory damage suffered by each Plaintiff and the Estate of A.S.;

2. An award for wrongful death damages for the parents and heirs of the Estate of A.S.; and

3. For other relief as the Court deems just and proper.

## Jury Demand

Plaintiffs respectfully request a trial by jury.

RESPECTFULLY SUBMITTED this 12th day of December 2023.

**COK KINZLER PLLP**

BY:___/s/  Travis W. Kinzler_____
     Travis W. Kinzler
     35 North Bozeman Avenue
     P. O. Box 1105
     Bozeman, Montana 59771-1105

     *Attorneys for the Plaintiffs*